**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
CLARKSBURG**

**UNITED STATES OF AMERICA,**

> **Plaintiff,**

**v.**                                                    **Criminal Case No.: 1:20-CR-38-1
(JUDGE KLEEH)**

**TYREESE MARSH**,

> **Defendant.**

**REPORT AND RECOMMENDATION RECOMMENDING THAT
DEFENDANT TYREESE MARSH'S MOTION TO SUPPRESS BE DENIED**

Presently pending before the undersigned Magistrate Judge is Defendant's Motion and Memorandum of Law to Suppress Evidence Seized as a Result of Traffic Stop and any Evidence Seized as a Result of Subsequently Obtained Search Warrants [ECF No. 52], filed on October 13, 2020. By Order dated October 14, 2020, United States District Judge Thomas S. Kleeh referred the motion to the undersigned for conducting a hearing and entering a report and recommendation as to disposition of the motion. [ECF No. 53].

The undersigned also is in receipt of Defendant's Supplement to Previously Filed Motion, filed on October 20, 2020 [ECF No. 58], the Government's Response in Opposition to Defendant's Motion, filed on October 21, 2020 [ECF No. 60], and Defendant's supplemental Memorandum of Law, filed on October 27, 2020. [ECF No. 70]. The undersigned conducted a hearing on Defendant's motion on October 23, 2020, at which the Court heard witness testimony, accepted exhibits into evidence, and heard the argument of counsel for both Defendant and the Government.

Based on a detailed review of Defendant's Motion [ECF No. 52], Defendant's Supplement to Previously Filed Motion [ECF No. 58], the Government's Response [ECF No. 60], Defendant's supplemental Memorandum of Law [ECF No. 70], the exhibits introduced into evidence at the

1

hearing on Defendant's motion, and the testimony given by witnesses and oral argument of counsel offered at said hearing, the undersigned **RECOMMENDS** that Defendant's motion be **DENIED** as set forth herein.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Defendant Tyreese Marsh ("Defendant") stands accused in a five-count indictment which a Grand Jury returned against him and two co-defendants, Dejuan Bernard Williams and Regano Harley Jones, on August 18, 2020. [ECF No. 1].  Defendant is named in all five counts of the Indictment, namely: (1) Conspiracy to Possess with Intent to Distribute Controlled Substances, in violation of Title 21, United States Code, Sections 846, 841(b)(1)(A)(viii), and 841(b)(1)(C); (2) Possession With the Intent to Distribute 50 Grams or More of Methamphetamine, in violation of Title 18, United States Code, Section 2, and Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A)(viii); (3) Possession With the Intent to Distribute Heroin, in violation of Title 18, United States Code, Section 2 and Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C); (4) Possession With the Intent to Distribute 28 Grams or More of Cocaine Base, in violation of Title 18, United States Code, Section 2, and Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B)(iii); and (5) Possession of Firearm in Furtherance of a Drug Trafficking Crime, in violation of Title 18, United States Code, Section 924(c)(1)(A).

Defendant was a passenger in a vehicle, a 2019 Jeep Cherokee (the "Jeep") stopped by law enforcement on October 11, 2019. The events of that stop and subsequent fleeing of the scene give rise to the above-noted Indictment. The Jeep was stopped for speeding using the "pacing" method of determining a vehicle's rate of speed.[1] During the stop, the Jeep fled, during which time objects including controlled substances were thrown from the Jeep. Once the Jeep was stopped a second

---

[1] Pacing is a method by which a vehicle follows another vehicle and matches the speed until the gap between the vehicles is constant, such that the speed of the two vehicles is the same.

time, its occupants, including Defendant, were arrested and incriminating items found on their person. Law enforcement ultimately impounded and searched the Jeep, leading to collection of further evidence giving rise to the Indictment.

In his motion to suppress, Defendant argues that the officer initiating the traffic stop for speeding did not have probable cause or reasonable suspicion to stop the vehicle based solely on the officer's pacing of the vehicle. Thus, according to Defendant, any evidence later obtained by law enforcement pursuant to the stop, and under the subsequent search warrant, must be suppressed as "fruits of the poisonous tree." The Government, on the other hand, opposes Defendant's motion, arguing that the officer's pacing technique was not faulty. Further, the Government argues that that even if the pacing technique was flawed, there is sufficient "attenuation" based on the facts for a subsequent and lawful search and seizure of incriminating evidence.

## II. SUMMARY OF TESTIMONY

During the aforementioned suppression hearing on October 23, 2020, the Court heard sworn testimony from the following witnesses: (1) Lt. Les Clifton of the White Hall, West Virginia Police Department, (2) Chief Gino Guerrieri of the White Hall, West Virginia Police Department, and (3) Ptlm. Jakob Streyle of the Fairmont Police Department, a K-9 handler.

The Court also received into evidence the following:[2] (1) Government's Exhibit 1, the display of the odometer of the police vehicle used to initiate the first stop of the Jeep, indicating manufacturer certification of the odometer's accuracy [ECF No. 63-1], (2) Defendant's Exhibit 1, a log of Marion County, West Virginia dispatches from October 11, 2019 [ECF No. 63-3], (3)

---

[2] The Court also considered the Government's Exhibit 2, a document from the manufacturer of the police vehicle indicating how the vehicle's speedometer is calibrated [ECF No. 63-2]. Defendant objected to its admissibility. The Court allowed Government's Exhibit 2 into the record for identification and deferred a ruling on its admissibility. [2:07:17 to 2:09:58]. Upon further review, and to the extent it is necessary to do so, the Court **FINDS** that Government's Exhibit 2 is immaterial to the Court's review of the issues raised herein and thus accords it no weight.

Defendant's Exhibit 2, a Google Maps depiction of the area of the first stop of the Jeep, with calculation of a distance of 1004.54 feet [ECF No. 63-4], (4) Defendant's Exhibit 3, a Google Maps depiction of the area of the first stop of the Jeep, with calculation of a distance of 673.06 feet [ECF No. 63-5], (5) Defendant's Exhibit 4, a Google Maps depiction of the area of the first stop of the Jeep, with calculation of a distance of 1563.66 feet [ECF No. 63-6], (6) Defendant's Exhibit 5, a Google Maps depiction of the area of the first stop of the Jeep, without a calculation of any distance [ECF No. 63-7], (7) Defendant's Exhibit 6, a Google Maps depiction of the area of the first stop of the Jeep, with calculation of a distance of 901.07 feet [ECF No. 63-8], (8) Defendant's Exhibit 7, a hand-drawn depiction by Lt. Clifton of the area of the first stop of the Jeep [ECF No. 63-9], (9) Defendant's Exhibit 8, regulations from the State of Florida regarding accuracy of vehicle speedometers [ECF No. 63-10], (10) Defendant's Exhibit 9, statutes from the State of Pennsylvania regarding accuracy of vehicle speedometers and use of the same for pacing [ECF No. 63-11], and (11) Defendant's Exhibit 10, statutes from the State of Virginia regarding accuracy of vehicle speedometers [ECF No. 63-12].

According to Lt. Clifton's testimony at the suppression hearing,[3] Defendant was a passenger in the Jeep, which law enforcement stopped on October 11, 2019. Specifically, on that date, Lt. Clifton utilized the "pacing" method to determine that the Jeep was traveling at a rate of speed of 52 mph in a 40 mph zone. [1:37:00 to 1:41:50]. Lt. Clifton, who was positioned behind the Jeep at a traffic light, had focused on the Jeep based on the high rate of speed at which it accelerated at the traffic light, and its presence in an area known to law enforcement for drug trafficking. Id. Lt. Clifton, who paced the Jeep for approximately 1/8 mile, initiated a stop for

---

[3] The citations here to times in brackets correspond to the times of the Court's archived audio recording of the suppression hearing on October 23, 2020, which is located on the section of the Court's intranet site for FTR recordings.

speeding. Id. The Jeep stopped at a small gravel lot near the entrance ramp of Interstate 79 South, which is along U.S. Route 250 South, in Marion County, in the Northern District of West Virginia. Id.

During this stop, Lt. Clifton identified three occupants of the Jeep: Regano Harley Jones, the driver; Dejuan Bernard Williams, the front seat passenger; and Tyreese Marsh, the back seat passenger on the driver's side. [1:42:32 to 1:43:25]. Jones and Williams provided Michigan identification; Defendant did not present identification but gave his name as Tyreese Marsh. Id.

During this stop, Lt. Clifton noticed a shoe box beside Defendant in the back seat of the Jeep. [1:44:08 to 1:44:28]. Lt. Clifton also detected a marijuana smell emanating from the Jeep. [1:43:50 to 1:44:06]. White Hall Police Department Chief Gino Guerrieri then arrived on the scene. [1:45:39 to 1:45:50]. Guerrieri called for assistance from Ptlm. Streyle. [1:46:00 to 1:46:21]. As Ptlm. Streyle arrived at the location of the traffic stop, and before the K-9 could be deployed, the Jeep then fled, first on U.S. Route 250, then onto Interstate 79 South. [1:46:33 to 1:49:14]. Lt. Clifton pursued the vehicle. [1:49:25 to 1:49:41]. As the Jeep turned onto the Interstate 79 entrance ramp, the backseat passenger threw an item from the driver's side window. [1:49:42 to 1:50:10].

As Lt. Clifton gave chase, he traveled at speeds in excess of 120 mph to catch up to the Jeep. [1:50:50 to 1:51:08]. The Jeep eventually pulled to the shoulder of Interstate 79 and stopped, near Mile Marker 128.5. [1:52:06 to 1:53:38].

During the pursuit, Chief Guerrieri had stopped to collect items thrown from the Jeep when it fled the stop. [1:55:25 to 1:55:40 (Clifton testimony); 3:46:27 to 3:47:19 (Guerrieri testimony)]. Among the items was a shoebox, retrieved from the middle of Interstate 79, containing bags of what law enforcement suspected were controlled substances. [1:55:41 to 1:56:01 (Clifton

testimony); 3:47:18 to 3:47:54 (Guerrieri testimony)]. Chief Guerrieri found other items on the roadway, outside of the shoebox. [3:47:18 to 3:47:54].[4]

At the scene of the stop of the Jeep along Interstate 79, officers removed the occupants and took them into custody. [1:53:53 to 1:54:49]. Officers conducted pat searches of the occupants. Id. From the pat search of Defendant, Lt. Clifton found a large amount of cash and two small bags of marijuana. [1:56:19 to 1:57:10]. Further, law enforcement had the Jeep towed and impounded. [1:57:54 to 1:58:00] and obtained a search warrant to search the Jeep. [1:58:55 to 1:59:41]. From the search of the Jeep, law enforcement recovered additional items of evidence. [1:59:46 to 2:01:27]. Specifically, law enforcement recovered a small handgun, additional cash totaling more than $10,000.00, and mobile telephones. Id.

### III. LEGAL ISSUES AND ANALYSIS

The question before the Court is whether the evidence recovered during the pursuit of the Jeep after the first stop by law enforcement must be suppressed as "fruit of the poisonous tree." More specifically, the Court must determine (1) whether the first stop of the Jeep was lawful, based on the pacing method of determining the Jeep's speed, and (2) even if the first stop was not lawful, whether the doctrine of attenuation nevertheless renders the evidence admissible. Notably, Defendant's argument focuses on the first stop of the Jeep, and does not materially dispute the facts in this matter after the Jeep fled the first stop.

Defendant contends that the pacing method utilized to stop the Jeep the first time is an inaccurate, unreliable means of determining a vehicle's speed, at least in this instance. From the

---

[4] According to the Government, the substances recovered were approximately: 1 pound, 10 ounces of methamphetamine; 2.3 ounces of cocaine base; and 2.5 ounces of heroin/fentanyl mixture. [ECF No. 60 at page 4]. The Government states that the Drug Enforcement Administration laboratory reported the substances to be 686.8 grams of methamphetamine (98% pure), 19.144 grams of heroin and 43.285 grams of heroin in two different bags (both also possessing fentanyl, an fentanyl analogue, and/or other substances), and 81.32 grams of cocaine base. Id.

distance over which Lt. Clifton paced the Jeep, to the road and traffic conditions, to records of the calibration and maintenance of the police vehicle and its instruments, Defendant contends the pacing process in this instance was faulty. Thus, according to Defendant, the first stop of the Jeep was not lawful and evidence obtained thereafter must be suppressed. On the contrary, the Government points out that pacing is a longstanding and commonly accepted practice in law enforcement, proven to be an accurate and straightforward means of determining a vehicle's rate of speed. But even if Defendant is correct in his argument about pacing in this instance, according to the Government, the doctrine of attenuation applies here with the Jeep fleeing the scene of the first stop.

As a threshold matter, the undersigned notes the well-established principle that the Fourth Amendment of the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Further, longstanding caselaw provides that "[s]topping an automobile and detaining its occupants constitute a 'seizure' within the meaning of the [Fourth and Fourteenth] Amendments . . ." Delaware v. Prouse, 440 U.S. 648, 653 (1979). A law enforcement officer is permitted to stop a vehicle when the officer observes a vehicle violating a traffic law. See United States v. Ortiz, 669 F.3d 439, 444 (4th Cir. 2012); See also United States v. Palmer, 820 F.3d 640, 649 (4th Cir. 2016) (stating a traffic stop is reasonable at the outset "whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation. Without question, such a violation may include failure to comply with traffic laws.") (internal citation and quotation omitted).

Also well-established is the exclusionary rule – that a court should exclude evidence obtained by dint of law enforcement's unlawful arrest or search. See Mapp v. Ohio, 367 U.S. 643

(1961). Relatedly, however, a court should suppress evidence in a criminal matter "only … where its deterrence benefits of exclusion outweigh its substantial social costs." Hudson v. Michigan, 547 U.S. 586, 591 (2006) (citations and quotations omitted). One exception to the exclusionary rule is the attenuation doctrine, which provides that "[e]vidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'" Utah v. Strieff, 136 S.Ct. 2056, 2061 (2016) (internal citation omitted).

### A.   The undersigned finds that the first stop of the Jeep, utilizing the pacing method to determine its rate of speed, was reasonable and lawful.

In the instant matter, Lt. Clifton's employment of the pacing method to determine the Jeep was exceeding the speed limit, and the resulting traffic stop, was lawful.

As noted above, a police officer stopping an automobile is a seizure. Such a stop must arise from the officer's probable cause, if not at least reasonable suspicion, to do so. Under longstanding precedent, there is a two-pronged inquiry for the Court here: (1) whether, at the outset, law enforcement's action was legitimate, and (2) whether law enforcement's activities during the stop are reasonably related to the stop. See Terry v. Ohio, 392 U.S. 1 (1968); United States v. Vaughn, 700 F.3d 705, 709 (4th Cir. 2012); United States v. Hill, 852 F.3d 377, 381 (4th Cir. 2017). The Supreme Court has established that law enforcement's stop of an automobile is reasonable if the officer has probable cause that there has been a traffic violation. Whren v. United States, 517 U.S. 806, 810 (1996). The undersigned notes there is a canon of caselaw surrounding traffic stops, and within it, some confusion about the applicable standard – probable cause or reasonable suspicion – for such police activity, depending on the facts at hand. To be clear though, in this case, the

undersigned finds that Lt. Clifton had probable cause to initiate the first stop, and as such, also met the less-stringent reasonable suspicion threshold.

Here, Lt. Clifton determined that the Jeep in which Defendant was a passenger was traveling at a rate of speed of 52 mph along a stretch of road with a speed limit of 40 mph. Traveling at such a rate of speed obviously constitutes a violation of the law. See W. Va. Code § 17C-6-1 (setting forth criminality of exceeding the speed limit on a public road and penalties for the same). Lt. Clifton determined this rate of speed of the Jeep by pacing the Jeep over a distance of approximately 1/8 mile, according to his testimony.

Based upon his testimony, which the undersigned finds to be thorough and credible, Lt. Clifton utilized the pacing technique here in an accurate, reliable, and customary fashion. Lt. Clifton was trained in the pacing technique, has been employing it for several years, and utilizes the technique on nearly a daily basis. In the traffic stop at issue, his testimony indicates there was nothing about road, weather, traffic or other conditions which would have rendered the pacing technique inaccurate. He was able to engage in pacing for a distance of approximately 1/8 mile, which certainly appears to have been a sufficient distance to obtain the speedometer reading needed. Moreover, Lt. Clifton testified that his patrol vehicle was of recent vintage (purchased in May of 2019 when the events at issue here took place in October of 2019) and was experiencing no obvious mechanical, electronic, or other issues. Defendant's questioning as to conditions of the roadway and patrol vehicle, distance of the pacing, and other factors, while thorough and helpful, does not ultimately demonstrate that Lt. Clifton was inaccurate in his assessment of the speed of the Jeep.

Relatedly, the undersigned notes Defendant's citation to and introduction of statutes and regulations from other states as to the maintenance, regulation, and/or use of law enforcement

9

equipment and techniques to determine a motor vehicle's speed. [ECF Nos. 63-10, 63-11, and 63-12]. While the undersigned has reviewed these materials and appreciates the context in which these are offered, they are not binding on this Court. Moreover, based on the undersigned's review of these materials, there is nothing set forth therein which would cause the undersigned to discredit Lt. Clifton under the facts and circumstances at hand.

Thus, the undersigned finds that the initial stop of the Jeep was lawful and reasonable under the circumstances.[5]

> ### B. Even if the first stop of the Jeep was not lawful, the undersigned finds that the doctrine of attenuation renders the evidence admissible.

After the Jeep fled from the first traffic stop, law enforcement obtained contraband and other evidence incriminating Defendant during pursuit of the Jeep and in a search of the Jeep occupants and the Jeep itself once the pursuit ended. Even if the initial traffic stop of the Jeep was not lawful, the doctrine of attenuation applies to allow admission of (i) evidence obtained during pursuit of the Jeep once it fled the initial stop and (ii) evidence obtained, once the Jeep ultimately stopped, from a search of the Jeep and its occupants. The fact pattern here makes this analysis especially straightforward; after all, no physical evidence was collected during the first stop and there was no opportunity during the short duration of this stop for much of a factual situation to develop prior to the Jeep fleeing.

The attenuation doctrine operates to allow admission of evidence where there is a remote or interrupted occurrence between impermissible law enforcement action and acquisition of such

---

[5] The parties have made argument, put on testimony, and briefed the issue of Lt. Clifton detecting the smell of marijuana during the initial stop of the Jeep. While under different factual circumstances this may have transformed the nature of the traffic stop, detention and any resulting search and seizure, the undersigned finds it immaterial here under the facts at hand. This is because the Jeep fled from the scene of the first stop before the officer even had run occupants' identification or written a ticket, and before officers could utilize a K-9 or otherwise investigate any issue relating to the marijuana smell during the first stop. Once the flight from the first stop ensued, the attenuation analysis, as set forth herein, applies.

evidence. A three-prong test set forth in <u>Utah v. Strieff</u> guides a court in application of the attenuation doctrine.

> First, we look to the "temporal proximity" between the unconstitutional conduct and the discovery of evidence to determine how closely the discovery of evidence followed the unconstitutional search. *Id.,* at 603, 95 S.Ct. 2254. Second, we consider "the presence of intervening circumstances." *Id.,* at 603–604, 95 S.Ct. 2254. Third … we examine "the purpose and flagrancy of the official misconduct."

<u>Strieff</u>, 136 S. Ct. at 2062 (quoting <u>Brown v. Illinois</u>, 422 U.S. 590 (1975)). <u>See also</u> <u>U.S. v. McKinnon</u>, 92 F.3d 244, 247 (4th Cir. 1996).

### 1.      Attenuation first prong – temporal proximity

In the case at hand, the standard articulated in <u>Strieff</u> militates toward allowing evidence obtained by law enforcement. As for the first factor, temporal proximity, some minutes passed between the initial traffic stop and search of its occupants, and several hours passed between the initial traffic stop and search of the Jeep per a search warrant. Although the passage of time as to some events was only minutes, the fact pattern here demonstrates a clear shift in circumstances between the time of the initial stop and the Jeep fleeing, weighing toward admissibility of evidence.

### 2.      Attenuation second prong – intervening circumstances

More to the point, as for the second factor, intervening circumstances, the undersigned finds the sequence of events weighs especially heavily in favor of admitting evidence here. Importantly, no physical evidence was gathered during the initial stop. Then, the Jeep's occupants are alleged to have committed illegal acts anew, giving rise to their arrest independent of anything that happened in the run-up to and during the initial traffic stop. The Jeep was involved in a flight from the initial traffic stop, and in a high-speed chase on Interstate 79. During the chase, an occupant of the Jeep – allegedly Defendant here – threw controlled substances from the Jeep, which police collected shortly thereafter. And once the Jeep was stopped a second and final time, a pat-down of its occupants, including Defendant, yielded evidence of criminal activity, and a

subsequent search of the Jeep yielded more of the same. In short, alleged criminal actions by Defendant and other occupants of the Jeep after the initial traffic stop weigh greatly in favor of the application of the attenuation doctrine and admissibility of the evidence Defendant seeks to suppress.

### 3.      Attenuation third prong – purpose and flagrancy

As for the final factor – purpose and flagrancy of police misconduct – the undersigned earlier, of course, finds that it did not exist here. However, for the sake of argument, even if it did exist here, such misconduct would not bar admission of evidence. It appears that this prong of the test exists, as a matter of policy, to deter intentional or flagrant police misconduct. See Strieff, 136 S. Ct. at 2063. In the instant matter, nothing about Lt. Clifton's initial stop of the Jeep was flagrantly wrong or intemperate. Lt. Clifton, following established protocol and practice, made a determination that the Jeep was exceeding the speed limit and, accordingly, initiated a customary traffic stop. Moreover, nothing about the established protocol and practice of pacing – at least as to Lt. Clifton's and his department's use of it – is shown here to be in bad faith or in contravention of constitutional norms and principles. The undersigned here does not discern police conduct in need of deterrence.

Thus, the undersigned finds that the attenuation doctrine applies here to render the evidence admissible.

### C.      Ancillary matters – Law enforcement's good faith and Defendant's abandonment of evidence weigh in favor of admissibility.

Federal authorities from the Drug Enforcement Administration ultimately became involved and obtained a search warrant for the Jeep, utilizing information from DEA officers in the field as well as from those with the White Hall Police Department. [ECF No. 60-1]. The Government argues that even if Lt. Clifton's initial stop of the Jeep for speeding was without reasonable

suspicion or probable cause, the evidence later obtained by dint of a search warrant was done so in good faith and thus is admissible. The undersigned agrees. "[W]hen an officer's belief in the existence of probable cause is objectively reasonable, her or she has no reason to second guess the magistrate's decision to issue a warrant, and acts in good faith when executing the search." United States v. Thomas, 908 F.3d 68, 73 (4th Cir. 2018). Here, the collection of information and preparation of materials in support of a request for a search warrant in no way would have objectively led an officer involved to question the warrant's validity or the objectivity of the process giving rise to it. Thus, to the extent which the good faith exception to the exclusionary rule applies, the undersigned finds the evidence admissible.

As a final matter, the Government makes, briefly, an argument that Defendant abandoned the evidence when it was thrown from the Jeep after the initial traffic stop, during the chase. [ECF No. 60, at pages 13-14]. The Government cites Fourth Circuit authority for the proposition that Defendant had not privacy interest in such abandoned property. See United States v. Stevenson, 396 F.2d 538 (4th Cir. 2005); United States v. Simmons, 437 Fed. Appx. 215 (4th Cir. 2011). The undersigned is unaware of any authority to the contrary. Thus, to the extent which the Government's analysis may demonstrate admissibility of the evidence for lack of a privacy interest, the undersigned finds the evidence admissible.

## IV. CONCLUSION

For the reasons set forth herein, the undersigned **RECOMMENDS** that Defendant's Motion and Memorandum of Law to Suppress Evidence Seized as a Result of Traffic Stop and any Evidence Seized as a Result of Subsequently Obtained Search Warrants [ECF No. 52] be **DENIED**.

Any party may, on or before **Tuesday, November 3, 2020,**[6] file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.  A copy of such objections should also be submitted to the Honorable Thomas S. Kleeh, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.  28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of Court is **DIRECTED** to transmit copies of this Report and Recommendation to counsel of record as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted October 29, 2020.

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE

---

[6] Although parties usually have 14 days to respond to a Report and Recommendation such as this, that is a maximum time to respond, not a minimum. In this matter, the pretrial conference is scheduled for November 5, 2020 and the jury selection and trial for November 17, 2020.